1
2
3
4                    UNITED STATES DISTRICT COURT
5                 NORTHERN DISTRICT OF CALIFORNIA
6
7   RENE A. FONSECA,                          Case No. 23-cv-01719-WHO (PR)
8                        Petitioner,
                                              **ORDER DENYING PETITION FOR**
9           v.                                **WRIT OF HABEAS CORPUS**
10  RON BLOOMFIELD,
11                       Respondent.

12

13                           **INTRODUCTION**

14          Petitioner Rene A. Fonseca seeks federal habeas relief from his California state

15  convictions for rape and other crimes.  None of his habeas claims has merit.  His claims of

16  instructional error are without foundation because the jury instructions correctly articulated

17  state law and directed the jurors to consider the very issues he wished them to consider; his

18  claim that the admission of the testimony of a rape trauma expert violated his

19  constitutional rights fails to state a remediable claim; his claim that the denial of his new

20  trial motion violated his rights does not state a cognizable habeas claim; and his claim that

21  the removal of a juror during deliberations was constitutionally erroneous is undone by the

22  clear evidence that the juror refused to follow the law.  The petition for habeas relief is

23  DENIED.

24                           **BACKGROUND**

25          In 2019, Fonseca was convicted by a San Francisco County Superior Court jury of

26  rape by intoxication (Cal. Penal Code § 261(a)(3)), two counts of oral copulation by

27  intoxication (*id.* § 288a(i)), sexual penetration with a foreign object by force and violence

28  (*id.* § 289(a)(1)(A)), and misdemeanor sexual battery (*id.* § 243.4(e)(1)).  (Ans., State

United States District Court
Northern District of California

1    Appellate Opinion, Dkt. No. 9-13 at 21; *People v. Fonseca*, No. A159178, 2022 WL

2    15623908, at *9 (Cal. Ct. App. Oct. 27, 2022.)).  A sentence of nine years in state prison

3    was imposed.  (Ans., State Appellate Opinion, Dkt. No. 9-13 at 21.)  Fonseca's attempts to

4    overturn his state convictions in state court were unsuccessful.  This federal habeas petition

5    followed.  Respondent filed an answer; Fonseca did not file a traverse.

         The state appellate court summarized the facts as follows:

> The complaining witness (E.L.) is related to [Fonseca] through her father,
> who is [Fonseca]'s first cousin.[1]  [Fonseca] is about 10 years her elder, and
> she always referred to him as her uncle, or 'tio.'  They did not grow up
> together and saw each other infrequently, only at family gatherings a couple
> of times a year.

> At the time of the events in question, [Fonseca] had recently graduated from
> medical school and was looking ahead to start a career in medicine.  E.L. was
> 20 years old and on summer break after her sophomore year of college, living
> at home in San Francisco with her parents and her younger brother who then
> was around 17 years old.

> E.L., by her own account, had a 'pretty high' tolerance for alcohol.
> Unbeknownst to her parents, she had begun occasionally drinking in high
> school and in college she drank frequently.  She estimated she had blacked
> out from drinking around five times in the past (and at the preliminary
> hearing, put the figure at five to ten times), and testified it would take five or
> six drinks before she felt drunk.  She had a fake ID to get into bars with her
> friends, and also had previously used both marijuana and cocaine.  Her
> parents knew none of this, and until the night in question had never even seen
> their daughter inebriated.

> **A.    The First Bar**

> On the night in question (July 13, 2019), both [Fonseca] and E.L. each
> (separately) attended a Friday night San Francisco Giants baseball game with
> friends, and then afterwards went to a bar across the street from the stadium
> called Pedro's Cantina where they encountered each other by coincidence.

> E.L. estimated that she arrived at the bar between 10:00 and 10:30 p.m. By

---

[1] "The parties referred to her below as [Fonseca's] 'second cousin,' although technically
she is defendant's first cousin once removed.  For purposes here, we refer to her as his
'cousin.'"

United States District Court
Northern District of California

that time she had already consumed two shots of cognac (immediately before arriving at the game, around 6:30 or 7:00 p.m.) and one beer (at the game) and had smoked some marijuana (also before the game). But she testified that when she got to the bar, she felt 'perfectly fine.' [Fonseca] too had been drinking with friends, both before and during the game.

Once [Fonseca] and his cousin noticed each other at Pedro's Cantina, about a half an hour after she arrived there, the two spent about an hour there together, socializing and drinking with [Fonseca]'s friends, Ben and Jonathan. When E.L.'s friend Samantha departed to go to a different bar across town, E.L. appeared to Samantha to be fine and she remained behind with [Fonseca] and his friends because he had offered to give her a ride home. E.L. testified that [Fonseca] acted respectfully toward her during their time at the bar, was kind and treated her like a family member and made no effort to touch her inappropriately. Indeed, at one point, one of his friends made a crude sexual comment to her (asking if she was a virgin), and [Fonseca] told him to 'cut it out,' which she appreciated. She testified she felt safe and comfortable with him and was enjoying herself. In all, E.L. consumed three drinks during the roughly one-and-a-half hours she was at Pedro's Cantina: one shot of tequila while socializing with friends before she and [Fonseca] spotted each other, another shot of tequila [Fonseca] bought for her, and a glass of beer she drank hastily at [Fonseca]'s urging right before they left the bar.

[Fonseca] and his two friends, Ben and Jonathan, left Pedro's Cantina with E.L. around 11 or 11:30 p.m. E.L. testified that at this point, after having quickly guzzled the beer, she was feeling 'pretty drunk.' She testified that on a scale from one to ten, she was around a six. She testified that she stayed with [Fonseca] rather than going home because she was drunk and 'didn't really have any decision-making skills at that point' and knew he would take her home at the end of the night.

## B.   The Second Bar

The group ended up at a second bar called John Collins. The [Fonseca]'s friend Ben drove them there, after they all walked about 10 minutes to get to his car. E.L. testified she had no recollection of how she got to that second bar and no memory of the car trip. All she remembered was walking on concrete and then at some point arriving at John Collins, presenting her fake ID to the bouncer and walking in.[2] She couldn't remember what time they arrived there; Ben estimated it was around midnight.

---

[2] "Although she was confused about where she was when she left the first bar, she acknowledged that she could still walk and did not stumble."

United States District Court
Northern District of California

[Fonseca]'s two friends had limited knowledge of what transpired at John Collins. Ben was in and out of that second bar, sometimes going outside to use his phone. He stayed for only about an hour and then left because he lost track of his friends. [Fonseca]'s other friend, Jonathan, was so intoxicated he could barely remember the car ride to John Collins and was 'blurry' about what happened there. He vaguely recalled seeing [Fonseca] at the bar with a young woman and then, after briefly speaking to them, he just went off into the crowd on his own and later on left the bar without ever seeing the two again.

E.L. could not remember much, either. She testified that her memory of John Collins was 'cloudy' and that she blacked out while she was there. All she could recall was going inside the second bar, sitting down, taking some videos on her phone and having some drinks with [Fonseca] and his friends.[3] She could remember nothing else. She recalled having at least two shots of tequila at John Collins but couldn't recall how much more alcohol than that she might have consumed. Ben didn't see her drink a shot of tequila and did see her have a mixed drink.

E.L. also ingested cocaine while at John Collins but had no recollection of that. Ben testified that about 20 minutes after the group arrived there, he saw [Fonseca] offer her cocaine and saw the two of them snort it together outside in the doorway of a nearby building. He also saw the two go back outside together for a few minutes one or two more times after that. And a forensic urine analysis confirmed cocaine use by E.L. at some point during a window of time that included when she was at John Collins. E.L., though, testified she did not remember doing cocaine that night.

E.L. testified she felt 'really drunk' at John Collins; she could talk and walk and was aware of who she was with, but 'my mind kept going in and out of the situation . . . [¶] Like I knew where I was and then [in] a second I kind of didn't really know where I was and then I would snap back into knowing where I was. I was just starting to feel really intoxicated at that point.' She was blacking out, and she estimated that, on a scale of one to ten, her level of intoxication was a nine.

A little bit after midnight, [Fonseca] texted E.L.'s father out of the blue with a happy birthday greeting (it recently had been her father's birthday). Her

---

[3] "Several videos that she posted to Instagram around 12:21 a.m. were played for the jury, in which she acknowledged she was being playful and having fun. One depicts [Fonseca]; another depicts the two of them seated in close physical proximity as [Fonseca] makes a peace sign for the camera and puts his hand on her head; and the third depicts a bartender pouring drinks for them. A reasonable factfinder could conclude that E.L. appears to be intoxicated in the second video clip."

father, who had been asleep and didn't know the two were together, thought it was 'weird' but didn't think anything of it and went back to sleep.

Sometime after midnight, at around 12:00 or 12:30 a.m., E.L. placed a drunken phone call to her friend Samantha but had no memory of doing so.[4] Samantha testified she sounded drunk, was slurring her speech, did not sound coherent or alert, and wasn't understanding Samantha's questions.[5]   At the time, Samantha thought it was perhaps because E.L. couldn't hear her very well because it sounded loud in the background and it was also loud where Samantha was (at a bar).   But Samantha didn't really know what to think and the conversation just felt 'weird.'   Samantha told E.L. to text her when she got home that night, but no text ever came.

**C.      The Car Ride Home**

Last call at John Collins was at 1:45 a.m.   Evidence of an Uber receipt established, by stipulation of the parties, that [Fonseca] escorted E.L. home in an Uber Pool ride share at 1:54 a.m., and arrived at her home 16 minutes later at 2:10 a.m.

E.L. couldn't remember how long they stayed at the second bar and had no memory of leaving there.   All she remembered was walking for what felt like 'a while' on sidewalk and concrete with [Fonseca] and his friends and feeling 'really confused.'   Then, she remembered getting into a car with [Fonseca] and people she thought were his friends and thinking his friend was driving, which she later realized made no sense because they had all been drinking. She could remember nothing else of the car ride home.   She was feeling 'really confused' and '[r]eally, really drunk at that point.'   On a scale from one to ten, she testified she was 'like a ten because . . . it was really foggy. All I remember from the car ride is being inside of a car for an undetermined

---

[4] "The defense asked her if the phone call of which she had no memory was around the time she was in a car going home, to which she answered yes.   However, she had no memory of what time she was in the car.   Samantha testified the phone call was at 12:00 or 12:30 a.m., whereas Uber records established that she did not get in the car until 1:54 a.m."

[5] "As Samantha described it, 'She just sounded different.   She sounded—she just kept— when she would ask me where I was I was telling her where I was and she said she was gonna come to me and I told her I'm leaving to go back home and she just—it was just weird.   I could tell something was wrong but I didn't think much of it at the moment because I thought, well, she's with her uncle so she's okay, she is in good hands.' Explaining further, she testified, 'I kept asking her a question and she would disregard what I was saying and just told me that . . . she was gonna come to the bar that I was at, but I kept telling her I'm not at the bar, I'm leaving [to go] home.   And I asked her if one of my friend's uncle[s] was still there and she just disregarded it and just kept saying something else.   So I just felt that the whole conversation was a little weird to me.   I just could tell something was not up, but I just thought that, oh, okay, maybe she's just intoxicated but she's okay because she's with her uncle.'"

amount of time.'

While apparently still at the bar, E.L. had a text exchange with her brother that ended around 1:33 a.m., but she had no recollection of texting with him. Only a portion of the text exchange was introduced into evidence (through a screen shot) and it does not indicate what time the exchange began. E.L. indicated to her brother that she would contact him when she got home so she wouldn't have to ring the buzzer (which was a reference to their locked front door), said she was with 'Anndredito' which was a reference to her ex-boyfriend, and the rest was gibberish to him.[6] At trial, she testified she was so drunk that the reference to 'Anndredito' was a typographical mistake; she told police she was so drunk when she sent the text that she thought she was with her ex-boyfriend.

Meanwhile, [Fonseca] was reaching out to E.L.'s father. At around 1:30 a.m., which was about 25 minutes before the two got into an Uber, [Fonseca] called her father twice but her father didn't pick up when he heard the phone ring. Then her father got worried, and so he got out of bed and returned [Fonseca]'s phone calls. The two spoke, and [Fonseca] told her father he was with E.L. and asked her father where to bring her, and her father asked [Fonseca] to bring her home. E.L.'s father then checked his daughter's whereabouts with a tracking app on his phone and could see they were near Yerba Buena Gardens on Mission Street. Her father texted [Fonseca] around 1:51 a.m. asking if E.L. was still with Samantha, and [Fonseca] responded, 'I'm gonna drop her off at [—] Street' where they lived. Then her father tried to call his daughter to see if she was okay. He testified she called him back, around 2:00 a.m., and said she was coming home. It was a quick call, just a couple of words and they did not converse, and he couldn't tell she was drunk and was not concerned. But he stayed up waiting for them to arrive, and when their car pulled up he walked outside to greet them.

**D.    Arriving Home**

All E.L. remembered after her dim memory of a car ride was seeing her mother 'for a second' at the top of the stairs and '[j]ust being really excited to see my mom.' She had no memory of anything else, including going to bed. After that, all she remembered was being awakened in her bed in the middle of the night by [Fonseca] sexually assaulting her. However, testimony from her family and other evidence filled in the gaps between those memories.

---

[6] In response to her brother's question at 1:33 a.m. if she was coming back soon, she answered: 'tell a helita imm with anieliya,' to which he responded, 'What?' She then said, "imm with anndredito too.'"

As noted, Uber records established that E.L. arrived home around 2:10 a.m.

According to the sole toxicology expert (called by the prosecution), a forensic analysis of blood and urine samples taken the next day indicated that at this point in the night (at 2:30 a.m., specifically) her blood alcohol level would have been around .22, a figure that is nearly triple the legal driving limit (.08).   At that level of intoxication, the toxicologist testified, an individual would experience a range of potential impairments, depending on a variety of factors (including the pace at which they consumed the alcohol, their alcohol tolerance, their metabolism, their body weight and gender): 'It might vary from euphoria, excitement, increased sociability [and] decreased inhibitions [a]ll the way down to slowed speech, impairment in memory . . . that can actually lead to blackouts' as well as 'sedation, . . . being [so] lethargic' and also potentially even losing consciousness.   Alcohol consumption, he testified, has the potential to impair not just a person's judgment and cognition but also their motor functioning, including even impacting their ability to move and use their muscles, and can result in someone becoming passive and unable to resist.  Any cocaine in her system, the effects of which can last potentially up to two hours, would have increased the impact of the alcohol she consumed.  Based on a case-specific hypothetical, he opined that a person in her situation, given her size and alcohol and drug consumption that night, might have experienced an 'instant high' from cocaine followed by potential lethargy as they withdrew from the cocaine, as well as patchy memory followed potentially by a full blackout; their motor functions would likely be impaired to some degree (potentially manifesting in stumbling or being unable to walk without assistance); and so would their cognitive functioning.  The person's ability 'to think about the stimuli and about their surroundings and make decisions and thoughts about that,' he testified, 'would likely be affected.'  He also testified that cognitive impairments such as slurred speech or difficulty making judgments would be outwardly apparent to other people.

Both of E.L.'s parents described her condition as heavily intoxicated when she arrived home and largely consistent with the toxicologist's testimony. Her father testified she was incoherent and wobbly, and a 9 on an intoxication scale of 1 to 10.  Her mother testified she was 'completely intoxicated' and also put her at a 9, with 10 being completely passed out.  Her mother also testified they had to rely on [Fonseca] for information about what had happened, because E.L. was unable to follow or engage in conversation.

Her father saw her get out of the car and, although she walked up to him without assistance and without stumbling or falling, she looked wobbly to him.  He then helped her get up the front stairs because she couldn't climb them by herself.  Her mother, meanwhile, had emerged at the door at the top of the stairs.  When E.L. reached her mother, she put an arm around her

mother and began leaning on her mother, who had to hold E.L. up by the pant loops to help her walk. E.L., according to her mother, was just laughing and repeatedly blurting out, 'Mommy, Mommy, I love you. You're my best friend.'

At some point in this timeframe, [Fonseca] was talking to her mother, explaining. He told her mother he had run into his cousin at Pedro's Cantina, she was with friends who were planning to go to another bar, and he saw that she was drunk. So he told her friend she should remain with her family. He didn't mention buying her shots of tequila or taking her to another bar himself.

[Fonseca] had a similar conversation with E.L.'s father. [Fonseca] merely told her father that she had said she was going to go to another bar on Polk Street with her friends but he thought it wasn't a good idea and wanted to bring her home to be safe. [Fonseca] did not mention her level of intoxication to her father as a reason he brought her home, but simply told her father he had said to her, 'No, no, you're gonna stay with me and I'm going to take you home.' Again, he did not mention he had bought her shots of tequila or that he had taken her to another bar after Pedro's Cantina.

While the two men were talking, E.L.'s mother helped her into the kitchen and then to her bedroom, where she needed her mother's help to undress because she couldn't do it herself. Her brother, who had been awakened by the commotion and had gotten up to see what was going on, saw [Fonseca] talking with his father and overheard (but did not see) his sister stumbling and mumbling while their mother was getting her ready for bed.

E.L.'s mother took off her jacket and her top shirt layer, leaving her still clothed in a white top, her pants and her underwear. Then her mother walked her toward her bed, which was one of two in the room, and E.L. flung herself onto it. But she immediately got up and then 'threw' herself onto the other bed, which was not the one she normally slept in.[7] As she did so, her top came down and she pulled it back up and reached for the comforter. Her mother placed the comforter on top of her and asked if she wanted some water. E.L. didn't answer.

---

[7] "Both her brother and her mother denied that she fell down. Her brother told police he heard his sister stumble and fall but at trial he testified 'the best way I can describe it is just stumbling. I don't think—I wouldn't necessarily call it falling.' Their mother also denied that she fell down as she was getting into bed. She too mentioned a 'fall' in a statement she gave to police (the statement said, 'She threw herself on the far bed by the window, falls, and switches to the other bed') but she testified that her statement was in Spanish and there was a problem with the English language translation. She testified she never saw her daughter fall or bump into anything that night."

By this point (the precise timing is unclear), [Fonseca] and E.L.'s father had come to the bedroom doorway where they were watching what was going on. [Fonseca] repeatedly asked her, 'Do you want water? Do you want water?' but she didn't answer him, either. So her mother told him, 'I'm going to get her some water' and left the room to get it.

When her mother came back to the bedroom, [Fonseca] had stepped inside the room. Along with water her mother had brought a trash can, and she placed it beside her daughter's bed in case she vomited. Her daughter was lying in bed awake but said nothing. [Fonseca] urged his cousin to 'drink your water.' Then he and her mother left the bedroom and closed the door. Her mother estimated that, from start to finish, it took about 10 or 15 minutes to get her to bed from the time she arrived home.

After E.L. was put to bed, her parents spoke briefly with [Fonseca]. At her mother's request, her father (in pajamas) offered to drive [Fonseca] home, which was less than 10 minutes away. He declined the ride, said, 'No, it's okay. I could stay here,' and asked for some alcohol and the remote control to their television.[8] Even though [Fonseca] had never slept there before, her father didn't think his offer to sleep over was odd because he was family. So her father gave him a beer and the remote, and [Fonseca] turned on the television which came on at a loud volume. Her mother made up a bed for [Fonseca] on the couch in the living room, which was near her daughter's bedroom; they thanked him for bringing their daughter home and then went back to bed in their bedroom, which was downstairs directly underneath the living room.[9]

They had no concerns about [Fonseca]'s behavior when they saw him that night. He wasn't acting inappropriately toward their daughter, didn't seem to be rushing them out of the living room and back to bed, and seemed to be acting normally. They fell asleep and heard nothing further that night.

Meanwhile, back in his own bedroom, which was next to his sister's room, E.L.'s brother overheard her get up and go to the bathroom and then go back into her room and close the door. Then a short time later (anywhere from 10 minutes to less than an hour after he himself had gone back to bed), he heard his sister 'moaning' in her bedroom (a sound he demonstrated for the jury), and a few minutes after that he heard three 'slapping' sounds.[10] He has no

---

[8] "Her father did not tell police [Fonseca] asked for alcohol, but he testified the question was not asked."

[9] "Her mother estimated they went back to bed 30 or 40 minutes after the episode began, possibly between 2:15 and 2:45 a.m.; her father said it was about 30 minutes."

[10] "There is no audio record of her brother's demonstration of the 'moaning' sound he

idea what sex sounds like, didn't know what was happening and assumed she was 'moaning' because she was feeling sick since she was drunk.  The television was on in the nearby living room, and it was so loud it was keeping him awake.  So he peeked out of his bedroom, and when he did so he observed [Fonseca] was not on the couch.

## E.    The First Incident, at Night

As noted, E.L. had no memory of getting out of the car, getting ready for bed, going to her room, getting tucked in by her mother or getting up to go the bathroom.  What she did remember was being awoken from her sleep by the experience of getting vaginally penetrated from behind by [Fonseca]'s penis.

She described her memories of that sexual encounter in graphic detail for the jury, describing not only sexual intercourse but also [Fonseca] forcing his penis into her mouth and performing oral sex on her.  She also testified that in therapy, sometime around October 2018, she recalled something about the assault she had not previously told anyone involved in the case (including the treatment providers who saw her immediately afterwards or police):  that he was hitting her a lot while he was penetrating her from behind, which was 'really scary.'

She testified she was still intoxicated while this was going on, and '[i]t felt like a really bad dream.'  She was 'beyond a ten' on the scale of inebriation, did not have a clear memory of what was happening, and could not do anything while he was having sex with her—push him off her, resist, scream for help, talk or even move—because she was so drunk she was just a 'limp body.'  She described slipping in and out of consciousness, explaining that 'I would be awake for one second' and then '[i]t would turn black and then I would wake up again to just being assaulted.'  When he put his penis in her

_____

heard.  In closing argument, however, the prosecutor addressed the sound he had made on the witness stand:  'He heard moaning.  On the stand [he] was subjected to the question, Can you replicate the moan.  I'm certainly not going to do it because you all heard for yourself.  But this moan is not a moan.  *It's a groan.*  It's the noise of someone who is so incredibly intoxicated that [her brother] thought it was the noise of his sister being sick from alcohol.  *It was not a noise of pleasure.*  It was likely the noise of him forcing her limp body to have sex with him.'  (Italics added.)

When defense counsel made his closing argument to the jury, he did not contradict the prosecutor's characterization of the sound her brother demonstrated for the jury as 'not a noise of pleasure.'  He argued merely:  '[Her brother] heard this moaning.  And although he told police he heard moaning, demonstrated to the police the moaning, told you he heard moaning, . . . [the prosecutor] said it's groaning and something different.  So [the prosecutor] has her own take on it but he said it was moaning.  And he made the sound for you.  Without him we don't have any sounds coming from that room.  But certainly with him we know there's no yelling, screaming, fighting, anything like that, saying no, protesting, anything like that.'"

mouth she was 'horrified' but couldn't stop him, and 'I felt like I was gonna die. Like I thought I was quite literally going to choke and die.' She did not want any of it to happen, could not think clearly, and would not have consented under any circumstances to have sex with [Fonseca]. Never would she consent to have sexual relations with a relative.

## F.    The Second Sexual Assault, in the Morning

E.L. woke up the next morning (Saturday) around 7:50 a.m., scared, confused, still intoxicated (she estimated around an eight or nine) and naked, although she does not normally sleep naked. By this point, according to the forensic toxicologist, her blood alcohol level would have been around .14, still nearly twice the legal limit.[11] She had a headache and was extremely dehydrated but, at this point, had no trouble walking and so she got up and went to the bathroom for water. She saw [Fonseca] on the living room couch, but neither said a word. She returned to the bedroom, closed the door and began getting dressed; a few seconds later, he entered her room. He kissed her and, because she was afraid he would rape her again, she did not pull away and kissed him back. Without saying a word, he reached into her underwear and began touching her vagina; in shock, she pulled away from him twice before he relented. Then he left the room. She hid in her room, disoriented and exhausted, where she fell back asleep until after he left. Her father drove [Fonseca] home at around 11:30 a.m.

## G.    Reporting the Assault

Later that morning, after [Fonseca] had gone, E.L. called her friend Samantha and told her what had happened. She did not yet tell her parents because they had a birthday event to attend and she did not want to ruin the occasion. By the time she saw her friend, she had started to notice she had a small black eye, as well as bruising on her left leg and right arm, injuries for which she could recall no explanation but the assault of the previous evening.

Samantha took her to San Francisco General Hospital, where she remained for several hours and blood and urine samples were collected. She was throwing up from the effects of the alcohol and was given anti-nausea medication but declined to undergo a sexual assault examination that day because she would have had to wait several hours for the exam to begin, and she was too distraught and sick to wait around that long, preferring instead to return the next day. Samantha noticed bruising on her leg and under her

---

[11] "He described in some detail the kinds of impairments a person would still experience at that level which, although they would not likely entail a loss of consciousness or stupor, could still involve lethargy, slight motor function impairment and 'definitely' memory impairment."

United States District Court
Northern District of California

eye which neither Samantha nor E.L.'s mother had noticed the previous day.

The following morning, Sunday July 15, E.L. told her parents what had happened. She told them she didn't want it to ruin her life and wanted to go to work later that day. So that afternoon, before she went to work, her parents summoned a family meeting with other relatives to tell them what had happened and discuss the situation. At the meeting, they exchanged their recollections of the previous Friday night. They also prepared written statements to give to police.

At around 9 p.m., after work, E.L. returned to the hospital where she underwent a sexual assault examination. The nurse who performed it was qualified as an expert in sexual assault examinations and testified extensively about her findings as well as E.L.'s responses to her questions. She found bruises on both of E.L.'s arms (four on her right arm, including one on her shoulder, two on her triceps and one on the back of her forearm; and one on her left forearm), and a bruise on her upper left thigh. All were tender to the touch, which she testified gives some general indication of when the bruises happened (although not how), because tenderness does not last as long as visible bruising itself. She testified that, as is common with adult rape victims, there were no other signs of trauma including in E.L.'s genital area, and that the absence of physical injury does not correlate to whether an adult was raped.

DNA collected from E.L. during the exam was later found to match [Fonseca]'s. Specifically, his sperm DNA was found on her underwear and neck; his non-sperm DNA was found on her lips and breasts. His DNA was not found on her external genitalia, vagina or cervix.

On July 24, about 10 days after the incident, E.L. contacted police and was interviewed. The same day, she discovered a Facebook message [Fonseca] had sent her, apparently around the time of the incident, stating, 'How are you? We have to talk.' She opened the message after the police told her she could do so, showed it to them, and did not respond to it.
The following day, July 25, [Fonseca] was arrested.

## H.    The Aftermath

E.L. testified briefly about the incident's impact on her life. She testified, 'It's changed my life completely. I feel like it's touched every aspect of my life. Not just personally but with school, my friends.' She testified their family couldn't even stand to look at their home anymore and so they bought new furniture; and she switched bedrooms with her brother because she could not even be in the room where she had been assaulted. She dropped out of college because of anxiety, she has trouble being around people because she

has trust issues, her family had severed all communication with the [Fonseca]'s family and the incident had changed their entire family dynamic. Her father corroborated that she had dropped out of school because of the incident and now suffers from a lot of anxiety.

(Ans., State Appellate Opinion, Dkt. No. 9-13 at 3-19).

## STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), this Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law

was "objectively unreasonable." *Id.* at 409.

## DISCUSSION

### i.    Jury Instruction on Complete Defense of Mistaken Consent

Fonseca claims that the trial court violated his due process rights when it refused to instruct the jury on mistaken consent.  (Pet., Dkt. No. 1 at 6, 26-29.)  The instruction Fonseca wanted the jury to hear is as follows:

> The defendant is not guilty of this crime if he actually and reasonably believed that the woman was capable of consenting to [the act], even if that belief was wrong.  The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the woman was capable of consenting.  If the People have not met this burden, you must find the defendant not guilty.

(*Id.* at 26.)

The state appellate court rejected this claim because the proposed instruction was duplicative of other instructions that were given to the jury.  Also, if there was any error, it was harmless:

> The court instructed the jury in this case, 'Whenever I tell you the People must prove something[,] I mean they must prove it beyond a reasonable doubt.'  On rape by intoxication, it instructed as follows:

> 'To prove that the defendant is guilty of this [cr]ime the People must prove that:  One, the defendant had sexual intercourse with a woman; two, he and the woman were not married to each other at the time of the intercourse; three, the effect of an intoxicating substance prevented the woman from resisting; and, four, the defendant knew or reasonably should have known that the effect of an intoxicating substance prevented the woman from resisting.

> 'Sexual intercourse means any penetration, no matter how slight, of the vagina or genitalia by the penis.  Ejaculation is not required.

> 'A person is prevented from resisting if he or she is so intoxicated that he or she cannot give legal consent.  In order to give legal consent a person must be able to exercise reasonable judgment.  In other words, the person must be able to understand and weigh the physical nature of the act, its moral character, and probable consequences.  Legal consent is consent given freely and voluntarily by someone who knows the nature of the act involved.  If the

14

victim is so unsound of mind that she is incapable of giving legal consent, the fact that she may have given actual consent is not a defense.'

These instructions made clear that to prove the defendant was guilty of rape of an intoxicated woman, the People had to prove beyond a reasonable doubt that he knew or should have known E.L. was so intoxicated that she was incapable of giving legal consent.

. . . .

The instruction defendant requested here basically restated and duplicated the instruction the court gave on the elements of the crime, by telling the jury a defendant is not guilty of rape of an intoxicated person if he actually and reasonably believed the woman was capable of consenting to sexual intercourse.  This simply restated, in reverse, the last element in the instruction on that crime—that the prosecution was required to prove that the defendant knew or reasonably should have known E.L. was incapable of resisting, meaning so intoxicated that she could not give legal consent.  The point was adequately covered by the instructions the court gave on the prosecution's burden and the elements of the crime.

. . . .

Under the instructions given in this case, the jury found defendant guilty of rape by intoxication.  To do so, it necessarily found defendant either knew, or reasonably should have known, E.L. was so intoxicated she could not give legal consent.  In other words, the jury made an adverse finding against defendant on the mental element of the crime that was the subject of his requested instruction.

(Ans., State Appellate Opinion, Dkt. No. 9-13 at 24-25, 26, 29-30.)

A state trial court's refusal to give an instruction does not alone raise a ground cognizable in a federal habeas corpus proceedings.  *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988).  The error must so infect the trial that the defendant was deprived of the fair trial guaranteed by the Fourteenth Amendment.  *See id.*  Furthermore, the omission of an instruction is less likely to be prejudicial than a misstatement of the law.  *Walker v. Endell*, 850 F.2d 470, 475 (9th Cir. 1987) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).  Thus, a petitioner whose claim involves a failure to give a particular instruction, as opposed to an instruction that misstated the law, bears an "especially heavy burden."  *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*, 431 U.S. at 155).  The significance of the omission of such an instruction may be evaluated

15

1    by comparison with the instructions that were given. *Murtishaw v. Woodford*, 255 F.3d

2    926, 971 (9th Cir. 2001) (quoting *Henderson*, 431 U.S. at 156).

3          Habeas relief is not warranted. The state appellate court's conclusion that the given

4    instruction correctly communicated state law binds this federal habeas court. *Bradshaw v.*

5    *Richey*, 546 U.S. 74, 76 (2005). Therefore, any claim that the instructions were incomplete

6    or incorrect is not sustainable. Also, the prosecution was obligated under the given

7    instructions to show a lack of mistake, that Fonseca did not reasonably believe that E.L.

8    was capable of consenting. *See Bickham v. Davis*, No. 17-cv-00912-JST, 2018 WL

9    10563138, at *13 (N.D. Cal. Apr. 23, 2018) (the instructions that petitioner "knew or

10   reasonably should have known that the effect of an intoxicating substance prevented [Doe]

11   from resisting . . . placed the burden on the prosecution to prove that Bickham did not

12   reasonably believe that Doe was capable of consenting.").

13         Furthermore, strong evidence demonstrates that Fonseca could not have had a

14   reasonable belief that E.L. was capable of consenting and that he received a

15   constitutionally fair trial. At Pedro's she drank a shot of tequila Fonseca bought for her,

16   and "a glass of beer she drank hastily at his urging"; when they were at John Collins, she

17   had more tequila shots and took cocaine; her friend Samantha testified that E.L. "sounded

18   drunk, was slurring her speech, did not sound coherent or alert, and wasn't understanding

19   Samantha's questions" when they spoke on the phone that night; when she arrived at home

20   her father observed that she was "wobbly" and he "helped her get up the front stairs

21   because she couldn't climb them by herself"; Fonseca was in E.L.'s room when her mother

22   gave her water and put a trash can next to her; he encouraged her to drink water; and some

23   days after the assault he contacted her through Facebook and told her they needed to talk,

24   which is an indication of guilt.

25         The state court's rejection of this claim was reasonable and is entitled to AEDPA

26   deference. This claim is DENIED.

27   **ii.    Jury Instructions on Consent**

28         Fonseca claims that the trial court violated his due process right to a fair trial when

United States District Court
Northern District of California

it failed to give a complete instruction on the definition of consent. (Pet., Dkt. No. 1 at 6, 29-31.) He asserts that the following instruction should have been given: "In prosecutions under Section 261 [rape], 286 [sodomy], 287 [oral copulation], or 289 [forcible sexual penetration], or former Section 262 [spousal rape] or 288a [oral copulation], in which consent is at issue, 'consent' means positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." (*Id.* at 30.) The jury was instead instructed as follows:

> A person is prevented from resisting if he or she is so intoxicated that he or she cannot give legal consent. In order to give legal consent a person must be able to exercise reasonable judgment. In other words, the person must be able to understand and weigh the physical nature of the act, its moral character, and probable consequences. Legal consent is consent given freely and voluntarily by someone who knows the nature of the act involved. If the victim is so unsound of mind that she is incapable of giving legal consent, the fact that she may have given actual consent is not a defense.

(Ans., State Appellate Opinion, Dkt. No. 9-13 at 38.)

Fonseca's claim was rejected by the state appellate court because the given instruction correctly presented state law and therefore there was no error. Also, had there been any error, it would have been harmless because the given instructions conveyed the same meaning as the ungiven ones:

> Further, we agree with the People that any error was harmless under any standard, including beyond a reasonable doubt. Section 261.6's first sentence does not define consent merely as an act or expression of 'positive cooperation' but as one that is undertaken 'pursuant to an exercise of free will.' Under the instructions given, however, the jury necessarily resolved the 'free will' issue against defendant. [Citation omitted.] It found, under the instructions, that E.L. was unable to consent 'freely and voluntarily' because she did not 'know[ ] the nature of the act involved.' It also found that she was 'so unsound of mind that she [was] incapable of giving legal consent,' regardless of 'the fact that she may have given actual consent.' Thus, had the jury found she 'positive[ly] cooperat[ed],' it would not have found she did so 'pursuant to an act of free will' within the meaning of section 261.6, and therefore an instruction under the statute's literal language would not have resulted in an acquittal.

17

1    (*Id.* at 41.)

2           For the same reasons that habeas relief was not warranted for the instructions

3    discussed in Section i, above, it is not warranted here.  Any claim that the instructions did

4    not correctly present state law is without merit because the state appellate court found them

5    to be correct.  *Bradshaw*, 546 U.S. at 76 ("a state court's interpretation of state law,

6    including one announced on direct appeal of the challenged conviction, binds a federal

7    court sitting in habeas corpus.").  Also, the state appellate court reasonably determined that

8    the given jury instructions allowed the jury to consider the very issues Fonseca believes

9    they should have:  "'consent' means positive cooperation in act or attitude pursuant to an

10   exercise of free will."  It found that E.L. was unable to consent freely and voluntary

11   because she did not know the nature of the act involved.  This means that the jury

12   determined that she did not act pursuant to an exercise of free will.

13          To repeat, strong evidence demonstrates that E.L. did not consent pursuant to an act

14   of free will and that Fonseca received a constitutionally fair trial.  At Pedro's she drank a

15   shot of tequila Fonseca bought for her, and "a glass of beer she drank hastily at his

16   urging"; when they were at John Collins, she had more tequila shots and took cocaine; her

17   friend Samantha testified that E.L. "sounded drunk, was slurring her speech, did not sound

18   coherent or alert, and wasn't understanding Samantha's questions" when they spoke on the

19   phone that night; when she arrived at home her father observed that she was "wobbly" and

20   he "helped her get up the front stairs because she couldn't climb them by herself"; Fonseca

21   was in E.L.'s room when her mother gave her water and put a trash can next to her; he

22   encouraged her to drink water; and some days after the assault he contacted her through

23   Facebook and told her they needed to talk, which is an indication of guilt.

24          The state court's rejection of this claim was reasonable and is entitled to AEDPA

25   deference.  This claim is DENIED.

26   **iii.    Admission of Evidence from a Rape Trauma Expert**

27          Fonseca claims that the trial court violated his federal constitutional rights by

28   admitting evidence from a rape trauma expert, Dr. Stephanie Smith, a clinical

United States District Court
Northern District of California

1    psychologist, who testified for the prosecution.  (Pet., Dkt. No. 1 at 6, 31-33.)  He contends

2    that her testimony that "changes in behavior by the complaining witness following the

3    incident were indicia that she had in fact been raped" violated his due process right to a

4    fair trial.  (*Id.* at 32.)

5         "To put it in context, Smith's testimony totaled 36 pages out of a roughly 400-page

6    trial transcript, and half of her testimony was on cross-examination.  Most of her direct

7    testimony (14 of 18 pages) focused on how victims react to a rape as it is happening and

8    afterward and the effects of such reactions on memory of the events."  (Ans., State

9    Appellate Opinion, Dkt. No. 9-13 at 42.)  She testified that she never met, knew, or

10   interviewed either E.L. or Fonseca.  (*Id.*, Reporter's Transcript, Dkt. No. 9-6 at 12-13.)

11   The state appellate court rejected Fonseca's claim on state law and federal constitutional

12   grounds.

13        Habeas relief is not warranted on this claim.  There is no clearly established

14   Supreme Court authority that the admission of irrelevant or prejudicial evidence is

15   sufficient to justify issuance of the habeas writ, 28 U.S.C. § 2254(d)(1), and "[u]nder

16   AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally

17   unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly

18   established Federal law,' as laid out by the Supreme Court."  *Holley v. Yarborough*, 568

19   F.3d 1091, 1101 (9th Cir. 2009).  So far, the Supreme Court "has not yet made a clear

20   ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process

21   violation sufficient to warrant issuance of the writ."  *Id.*; *see also Walden v. Shinn,* 990

22   F.3d 1183, 1204 (9th Cir. 2021) (citing *Holley* when affirming the district court's denial of

23   a claim that the admission of "purportedly gruesome crime scene and autopsy photos"

24   violated due process); *Zapien v. Davis*, 849 F.3d 787, 794 (9th Cir. 2016) (citing *Holley*

25   when rejecting a claim that "the fundamental unfairness of admitting multiple hearsay

26   testimony" violates due process).  The state court's rejection of this claim was reasonable

27   and is entitled to AEDPA deference.  This claim is DENIED.

28

United States District Court
Northern District of California

### iv.    Denial of Motion for a New Trial

Fonseca claims that the trial court denied his due process rights when it denied his motion for a new trial, which was based on newly-discovered exculpatory evidence. (Pet., Dkt. No. 1 at 7, 33-35.) The evidence consists of "three YouTube videos E.L. had recorded and posted in the months before trial that defendant argued 'directly impeached [her] testimony that she has anxiety around other people and her testimony that implied that she no longer consumes alcohol.'" (Ans., State Appellate Opinion, Dkt. No. 9-13 at 71.)

This claim was rejected by the state appellate court because E.L.'s "credibility concerning that relatively collateral factual issue was not central to the proof of the crime":

> Even assuming the videos would have impeached E.L.'s testimony about her current drinking habits and/or the anxiety she now suffers from (the trial court found they would not do so in any material way), they would not have 'destroyed' the prosecution's case (or even E.L.'s credibility) unlike in the authorities [Fonseca] cites. [Footnote omitted.] [Fonseca]'s premise is mistaken, and vastly oversimplifies the prosecution's case. True, E.L.'s testimony about her social anxiety corroborated her claims about what had befallen her and, indeed, the prosecution made that very point in closing argument. But her credibility concerning that relatively collateral factual issue was not "central to the proof of the crime." [Citation omitted.] (Indeed, it was not even the only evidence of corroborating trauma; she also testified she had changed bedrooms and dropped out of school.) The trauma she suffered afterwards was by no means the prosecution's 'strongest' (or indeed only) evidence of guilt. Nor was her very brief testimony that she does '[n]ot really' currently drink (which was even less important, never mentioned by either party in closing argument and not even offered for any corroborating purpose (see footnote 38, ante, page 70)). As we have discussed, the prosecution's case rested on a wealth of other more direct evidence, including the uncontradicted testimony of three percipient witnesses to E.L.'s highly impaired condition at the time she arrived home, expert testimony about the kinds of cognitive impairments she would have experienced given her level of intoxication, E.L.'s unexplained bruising, the implausibility of her having sex *willingly* in such close physical proximity to her entire immediate family, and the obvious and compelling fact that, as defense counsel put it in closing argument, '[n]obody *in their sober mind* would want to have sex with their second cousin.' (Italics added.)

(*Id.* at 73-75.)

United States District Court
Northern District of California

1    Habeas relief is not warranted because there is no clearly established constitutional

2    right to move for a new trial, or to have such a motion granted.  "The Constitution itself, of

3    course, makes no mention of new trials."  *Herrera v. Collins*, 506 U.S. 390, 407 (1993)

4    (declining to find that Texas's refusal to entertain a new trial motion that was untimely

5    under state rules "transgresses a principle of fundamental fairness 'rooted in the traditions

6    and conscience of our people.'")  Rather, the right to file a new trial motion is a state

7    statutory right, not a constitutional one.  *See Gupta v. Beard*, No. CV 14-1709-CJC KK,

8    2015 WL 1470859, at *27 (C.D. Cal. Mar. 30, 2015) (quoting *People v. Dillard*, 168 Cal.

9    App. 2d 158, 167 (Cal. Ct. App. 1959)) ("A 'motion for new trial in a criminal case is a

10    [California] statutory right.'").  Violations of state law are not remediable on federal

11    habeas review, even if state law were erroneously applied or interpreted.  *Swarthout v.*

12    *Cooke*, 562 U.S. 216, 219 (2011).  Fonseca's claim that the denial of his motion for a new

13    trial violated his federal constitutional rights will be denied.

14    To the extent Fonseca claims that the video evidence constitutes new evidence of

15    innocence entitling him to habeas relief, that claim will be denied.  To be credible, a claim

16    of actual innocence "requires petitioner to support his allegations of constitutional error

17    with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy

18    eyewitness accounts, or critical physical evidence—that was not presented at trial."  *Schlup*

19    *v. Delo*, 513 U.S. 298, 324 (1995).  Then a petitioner must show that in light of the new

20    evidence it is more likely than not that "no reasonable juror would have convicted him,"

21    *id.* at 327, or that "every juror would have voted to acquit him," *Lee v. Lampert*, 653 F.3d

22    929, 946 (9th Cir. 2011) (en banc) (citing *Schlup*, 513 U.S. at 327) (Kozinski, J.

23    concurring).

24    Here, evidence that might undermine a collateral issue is not sufficient to show that

25    it is more likely than not that no reasonable juror would have convicted Fonseca.  As stated

26    before in this Order, and above by the state appellate court, there was strong evidence that

27    E.L. was severely intoxicated and could not have consented to having sex with Fonseca.

28    The state court's rejection of these claims was reasonable and is entitled to AEDPA

1    deference.  These claims are DENIED.

2    **v.**    **Excusing a Juror During Deliberations**

3    Fonseca claims that the removal of a juror (Juror No. 1) during deliberations

4    violated his right to an impartial jury.  (Pet., Dkt. No. 1 at 7, 36-38.)  The trial court

5    removed him after determining that he would not follow the law.  Fonseca asserts that the

6    removal was erroneous because the juror "merely harbored doubt as to [defendant's]

7    guilt"; the juror's statements were only "fair comments on the evidence"; and his

8    "misgivings about the prosecution's case were entirely consistent with his oath to critically

9    examine the charges and the evidence."  (*Id.* at 37.)

10    The state appellate court summarized the facts as follows:

11    About one and a half days into the jury's deliberations, Juror Number 1 sent
12    the court a note stating that 'Although I took the oath to apply the law as the
      charges are written, *I cannot*' (italics added), followed by a lengthy
13    explanation that is accurately quoted in the opening brief and will be discussed
      as relevant below.  The court, with counsel and defendant present, then
14    conducted a lengthy colloquy with the juror, also accurately quoted in the
      opening brief, in an effort to ascertain whether the juror was refusing to follow
15    the law.  After the juror answered the court's questions, and over defense
      counsel's objection, the court discharged him.  The court observed that, 'My
16    take on him is that if he were to follow the Court's instructions he would vote
17    guilty.  That's my take on him.  Whether that's accurate or not I don't know.
      But I think in view of all the circumstances I have no choice but to discharge
18    him.'

19
20    (Ans., State Appellate Opinion, Dkt. No. 9-13 at 75-76.)

21    Fonseca's claim was rejected by the state appellate court:

22    . . . Juror Number 1 made clear he thought the law was wrong [citation
      omitted], and he did so repeatedly—both expressly and in overall substance.
23    His note stated he could not 'apply the law as the charges are written' because
24    'I don't believe some of the charges are valid and I can't see my way past
      this,' and he said the conundrum made it 'especially not fair *to* . . . [E.L.]'
25    (italics added), thus implying he viewed the evidence as pointing toward
      guilt.  He expressed concern that 'the intoxication charges as defined' 'could'
26    apply to 'hundreds of sex acts in the city every day' and, indeed, 'could have'
27    applied even to *himself* 'at some point' in his own life 'and I certainly don't
      consider myself a rapist.'  His note expressed similar concerns about 'the
28    lessor [*sic*] charges of Assault and Battery,' which he wrote 'seem so

narrowly defined that how can the verdict *not* be guilty?'  (Italics added.)
Yet, he explained in substance that it also seemed extreme and unreasonable
to treat those acts as a criminal offense, writing:  '[a]s we walk the streets of
San Francisco and ride on public transportation, aren't we subjected to rude,
unwanted, forced contact all the time?  And maybe some even for sexual
gratification.  In this case was it rude, offensive, piggish, stupid, idiotic?  Yes.
But assault?  Battery?  [¶]  I must be completely out of tune with 2019 law
interpretation.'  (Italics added.)  Toward the end of his note he added that
'rendering a not guilty vote' would not be 'fair' to E.L., implying for a second
time that he believed the prosecution had proved its case under the law.
When questioned by the court, he again repeatedly implied he disagreed with
the law and expressed a strong moral objection to sitting in judgment of
defendant.

. . . Juror Number 1 also confirmed (repeatedly) that he was not willing to
abide by his oath to follow the law [citation omitted].  He said so twice in his
note:  in the very first sentence ('Although I took the oath to apply as written,
I cannot') and the last ('I feel awful about not upholding the oath').  And he
said so at least three times orally when questioned:  in response to the very
first question put to him, later on after additional discussion, and again in
response to the court's final question  ('THE COURT:  So, to be clear, you
cannot follow the law on any of the charges?  [¶]  JUROR NO. 1:  That's
right').

The record also clearly reflects that the trial court discharged the juror for
refusing to follow the law, and we do not understand the defendant to contend
otherwise.  Before the court questioned the juror, it told the lawyers that its
purpose in doing so would be to determine 'if he won't follow the law as the
Court has given it to him'; and then afterwards, the trial court specifically
cited *Williams* as the basis for its decision to discharge Juror Number 1.
In sum, this record does not show that Juror Number 1 'merely harbored
doubt as to [defendant's] guilt.'  On the contrary, the juror repeatedly implied
that, under the instructions, he would be required to convict defendant.  And
he told the court expressly that because the charges were not, in his mind,
'valid,' he could not follow the law.

(*Id.* at 78-80.) (footnotes omitted).

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of
impartial jurors.  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  An impartial jury is composed
of "jurors who will conscientiously apply the law and find the facts," *Wainwright v. Witt*,
469 U.S. 412, 423 (1985), and that is "capable and willing to decide the case solely on the
evidence before it," *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554

1    (1984).

2        A criminal defendant does not have the right to be tried by a juror who has

3    "explicitly indicated an inability to follow the law and instructions of the trial judge."

4    *Lockett v. Ohio*, 438 U.S. 586, 596-97 (1978).  A juror who is unwilling to follow the law

5    is considered biased and may be dismissed on that basis.  *Williams v. Johnson*, 840 F.3d

6    1006, 1010 (9th Cir. 2016).  A hearing should be held to investigate the facts and

7    circumstances, resolve the doubts raised about a juror's impartiality, and determine

8    whether removal of the juror is appropriate.  *Smith v. Phillips*, 455 U.S. 209, 216-17

9    (1982).  A trial court's finding that good cause exists to remove a juror is a factual finding

10   entitled to deference on habeas review.  *Perez v. Marshall*, 119 F.3d 1422, 1426 (9th Cir.

11   1997); *Knaubert v. Goldsmith*, 791 F.2d 722, 727 (9th Cir. 1986) (a federal habeas court

12   must accord the highest deference to a trial court's credibility determination); *cf. Patton v.

13   Yount*, 467 U.S. 1025, 1036-38 & n.12 (1984) (whether juror can render impartial verdict

14   is question of historical fact entitled to special deference).

15       Habeas relief is not warranted.  After receiving the juror's note that he would not be

16   able to follow the law, the trial court held a hearing to inquire into the matter, and was

17   presented with clear evidence that Juror No. 1 would not follow the law.  He explicitly said

18   so twice in his note and three times at the hearing; he stated he thought the law was wrong

19   and invalid and that "I can't see my way past this"; he said that calling Fonseca's acts

20   assault and battery was "extreme and unreasonable"; and said that "Although I took the

21   oath to apply as written, I cannot."  Removal of the juror was appropriate in light of such

22   clear evidence.  *Williams*, 840 F.3d at 1010 (removal of a juror who would not follow the

23   law, and was therefore biased, was appropriate).  The state appellate court's rejection of

24   Fonseca's claim was reasonable, and therefore is entitled to AEDPA deference.  This claim

25   is DENIED.

26                              **CONCLUSION**

27       The state court's adjudication of Fonseca's claims did not result in decisions that

28   were contrary to, or involved an unreasonable application of, clearly established federal

United States District Court
Northern District of California

1    law, nor did they result in decisions that were based on an unreasonable determination of

2    the facts in light of the evidence presented in the state court proceeding.  Accordingly, the

3    petition is DENIED.

4         A certificate of appealability will not issue.  Reasonable jurists would not "find the

5    district court's assessment of the constitutional claims debatable or wrong."  *Slack v.*

6    *McDaniel*, 529 U.S. 473, 484 (2000).  Fonseca may seek a certificate of appealability from

7    the Ninth Circuit Court of Appeals.

8         The Clerk shall enter judgment in favor of respondent and close the file.

9         **IT IS SO ORDERED.**

10   **Dated:**  November 1, 2024



WILLIAM H. ORRICK
United States District Judge